# In the United States Court of Federal Claims

No. 12-509C
(Originally Filed: October 12, 2012)
(Reissued: October 22, 2012)[1]

* * * * * * * * * * * * * * * * * * * *

YOUR RECRUITING COMPANY, INC.,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant*,

and

GOLDEN KEY GROUP LLC,

    *Intervenor*.

Bid Protest; Procurement Integrity Act; Alleged Plagiarism; De Novo Review.

* * * * * * * * * * * * * * * * * * * *

    *Rebecca E. Pearson*, Washington, DC, for plaintiff.

    *Joshua A. Mandlebaum* and *Won K. Lee*, United States Department of Justice, with whom were *Deborah A. Bynum*, Assistant Director, *Jeanne E. Davidson*, Director, and *Stuart F. Delery*, Assistant Attorney General.

    *Anthony H. Anikeef*, McLean, Virginia, for intervenor.

**OPINION**

BRUGGINK, *Judge*.

---

[1] Publication was deferred pending the parties' review for redaction of protected materials. Those redactions are indicated by brackets.

This is a post-award bid protest. Your Recruiting Company, Inc. ("YRC" or "plaintiff") challenges the award by the National Science Foundation ("NSF") of a task order to intervenor, Golden Key Group LLC ("Golden Key"). Currently before the court are plaintiff's motion to amend its complaint and motion for judgment on the administrative record, defendant's cross-motion for judgment on the administrative record and motion to strike documents attached to plaintiff's motion for judgment on the administrative record, and intervenor's motion to supplement the administrative record. The motions are fully briefed, and we heard oral argument on October 4, 2012. As we announced at oral argument and for the reasons explained below, we deny plaintiff's motions to amend and for judgment on the administrative record; we grant defendant's motion for judgment on the administrative record; we grant in part and deny in part defendant's motion to strike; and we grant intervenor's motion to supplement the administrative record.

## BACKGROUND[2]

On December 17, 2011 NSF issued Request for Quotations No. DACS11Q2151 in connection with the possibility of award of a firm fixed-price task order pursuant to the General Services Administration ("GSA") Federal Supply Schedule 738x for Human Resources Services. The award would be to provide support to NSF's Human Resources Management Services ("HRM") division for a base period of one year, with four additional option years. The work would consist of technical, operational, and administrative support in the areas of recruitment, position management, payroll processes, and other functions.

Plaintiff and intervenor each submitted a proposal to NSF for this task order, as did a number of other bidders. Although YRC and Golden Key had teamed together on a prior proposal, they submitted bids separately for the NSF proposal. The substance of YRC's argument here is that content within Golden Key's proposal was taken without permission from YRC and that this material was relied on by NSF in making the award to Golden Key. YRC's theory can be summed up in a statement from its motion for judgment on the administrative record: "by cribbing information from a proposal on which

---

[2] The facts are drawn from the Administrative Record ("AR").

YRC[] and [Golden Key] had teamed, whether unknowingly or intentionally, [Golden Key] made a false statement." Pl.'s Brief 28.[3]

The information at issue came into Golden Key's possession during its teamwork with YRC on a prior joint proposal to GSA. In order to facilitate joint work on that bid, YRC and Golden Key exchanged information subject to a Nondisclosure Agreement ("NDA"), executed in February 2011. That agreement contained the following provision with respect to proprietary information:

> All written proprietary information disclosed to the other party shall be marked with the legend "Proprietary Information[.]" Proprietary verbal or visual information shall be promptly confirmed in writing as Proprietary Information. In addition to information marked or confirmed as "Proprietary Information," both parties agree[] that "Proprietary Information" shall also include all data or other information disclosed to the other that a party could reasonably expect to be protected as confidential.

AR 1653. Proprietary information of the other party was to be used only in connection with the GSA proposal. AR 1653-54.

The parties designated representatives to work on the proposal, and those individuals met in person and communicated by email. Lauren Wingate, a deputy director for YRC, was the only person authorized under the NDA to send proprietary information on behalf of YRC to Golden Key. AR 1733. However, on March 1, 2011 she notified Barry Prokop of Golden Key that Joshua Tingle, a YRC employee, would be sending information in connection with developing the proposal. AR 1733-34. Tingle had worked for Golden Key in the past, but had recently moved to YRC in January of 2011. AR 1233, 1734.

As the due date approached for the proposal, Tingle and McCracken met with a Golden Key employee in Denver in order to collaborate on the proposal and to be near the GSA building at which the bid would be delivered. AR 1424. During those meetings, Tingle emailed an attachment entitled

---

[3] "Pl's. Br." refers to Plaintiff's Brief in Support of Motion for Judgment on the Administrative Record.

"Staffing Plan Docs YRCI.docx" ("Staffing Plan") to McCracken. AR 1424, 1434. The following text and chart were included in the Staffing Plan attachment sent by Tingle, and are claimed by YRC to be proprietary to it:

> **Approach to Staffing up as needed:** YRCI has more than [     ] recruiters specializing in recruiting Senior Acquisition Specialists, Senior Management Analysts, Senior Financial/Cost Analysts and other service professionals as their sole responsibility. Our candidate database consists of [     ] industry personnel resumes; containing candidates geographically dispersed with nearly [     ] in the National Capitol region.
>
> Our staffing policies and procedures are founded on the following points:
>
> [redacted]

AR 1082.

Tingle sent other documents in addition to the Staffing Plan. None of the attachments were designated "Proprietary Information" pursuant to the NDA. AR 1427, 1657. The covering emails did, however, bear the standard warning: "This message is for the designated recipient only and may contain privileged, proprietary, or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original email. Any other use of this email by you is prohibited." AR 1237.

The team submitted the joint proposal to GSA on April 8, 2011. It contained the same principles and chart from the Staffing Plan shown above, with minor changes to the team and recruiters that were used:

> **Approach to Staffing up as needed:** The GKG Team has more than [ ] recruiters specializing in recruiting Administrative Staff, Acquisitions, Senior Contracts Management Staff, Human Resources Managers, Program/Project Managers and other service professionals as their sole responsibility. Our teams [sic] candidate database consists of [ ] industry personnel resumes; containing candidates geographically dispersed with nearly 2,000 candidates located in Region 8.

AR 1400. The bid was unsuccessful. AR 1424.

Tingle did not stay long at YRC and was re-employed by Golden Key on June 23, 2011. AR 1426. The two companies partnered on more projects after that date, but prior to the conflict which arose between them in connection with the NSF proposal.

NSF issued its solicitation at issue here on December 17, 2011. At the time NSF employed nearly 1,700 employees for its mission of "support for all fields of fundamental science and engineering, except for medical science." AR 100. Much of the agency's mission involves evaluating and funding awards for federal research programs. AR 100. The HRM division of NSF administers the agency's personnel. AR 101. In broad terms, the solicitation's Statement of Work ("SOW") contemplated that the successful contractor would support HRM. This support would be "primarily operational in nature, much of which is transactional and behind the scenes." AR 102. There are nine functional areas covered in the SOW, including support for recruiting and staffing, position classification, and payroll administration. AR 103.

The analysis of each proposal was to be made on a best-value basis using procedures set out in Federal Acquisition Regulation ("FAR") 8.405-2 (2005). AR 72. There were four evaluation factors. The three non-price factors were, in descending order of importance, management plan, key personnel, and past performance. In combination, these three factors were significantly more important than price. AR 97.

The solicitation called on NSF to rate each factor on a scale ranging from 'poor' to 'excellent.' For the management plan, an excellent reflected a "comprehensive and thorough response of exceptional merit with one or more significant strengths. No deficiencies or significant weaknesses exist." AR 420. A very good plan showed "no deficiencies and demonstrates overall competence. One or more significant strengths have been found, and strengths outbalance any significant weaknesses that exist." AR 420.

NSF received and evaluated seven proposals, including those of Golden Key and YRC. It is uncontested that at least a portion of the information originating with YRC appeared on page 11 of Golden Key's 92-page proposal. AR. 133-211, 212-29, 1434. This page was in a section entitled "2.1 Sample Roster Plan" of part two of the proposal, which was entitled "Work - Organized and Managed." AR 142, 145. Section 2.1 is over two pages long, and the disputed content takes up half of one of those pages:

> **Approach to Staffing up as needed**
> The GKG Team currently has more than [     ] recruiters specializing in recruiting Human Resources Staff, Administrative Staff, Program/Project Managers and other service professionals as their sole responsibility. The GKG Team's HR candidate database consists of [     ] industry personnel resumes.
>
> **Our recruiting policies and procedures are founded on the following principals [sic]:**
>
> [redacted]

AR 146. As is apparent, these paragraphs and the numbers within them are virtually identical to the information Tingle sent to his Golden Key counterpart while he was working for YRC. The bullet points in the original are simply replaced by semi-colons. It is important to note that Golden Key used these paragraphs as part of its description of how it maintains its own staff, not how it proposes to help NSF locate and hire its employees.

After evaluation, Golden Key received a 'very good' rating for its management plan and a 'very good' rating overall. Two significant strengths were assigned: an ability to provide [ ] and an experience with [ ]. AR 435. Other strengths assigned to Golden Key's management plan were listed in eight bullet points. Evaluators found, for example, that the plan offered a good overview of [ ], a process to "[ ] (p10-12)," and a sound "[ ] strategy (p11)." AR 435-36. The parenthetical page references were to Golden Key's proposal. Those references include page 11, which has within it the same material that was sent by Tingle to Golden Key during joint work on the GSA proposal and which YRC claims as proprietary. Golden Key's plan received no significant weaknesses, other weaknesses, or deficiencies. AR 436.

YRC's proposal received an 'excellent' rating for its management plan and an 'excellent' rating overall. Included within its six significant strengths were its [ ] and [ ]. AR 433. Six bullet points noted other YRC strengths, including a plan for how to [ ]. The management plan received no significant weaknesses, other weaknesses, or deficiencies. AR 434.

Five other contractors submitted proposals and were rated. AR 477. For the base year of the task order, Golden Key submitted a price of [ ]. AR 474. Its aggregate quote, including option years, was $15,612,076.25. YRC's base year price was [ ], with an aggregate of [ ]. AR 474. All of the bids were less than the Independent Government Estimate ("IGE") of [ ] for the base year and [ ] for the aggregate. AR 473.

The procuring contracting officer, Gregory N. Smith, also served as the source selection authority. On April 19, 2012 in his Source Selection Decision, he weighed the award criteria against the evaluation results and the prices, and concluded that Golden Key provided "the best value." AR 483. Mr. Smith acknowledged that YRC had the best technical proposal, but its

price was the second highest and [ ] more than Golden Key's proposal. AR 484. Golden Key's proposal, although not as highly rated, was 'very good,' in part because of Golden Key's ability to [ ] and its "[ ]." AR 484. It had no weaknesses. In sum, YRC's "slight technical superiority" failed to "overcome the large price advantage" provided by Golden Key. AR 484. Mr. Smith awarded Golden Key the contract on April 19, 2012, and work was to begin May 1, 2012. AR 528.

On April 20, 2012 YRC's Vice President of Contracts and Pricing requested a debriefing so that YRC could understand how NSF made its best value determination. AR 965. After this debriefing, YRC filed a protest on April 30, 2012 with the Government Accountability Office ("GAO"). AR 730. A few days later YRC submitted a letter to NSF regarding a "Notice of Possible Procurement Integrity Violation." AR 1069. While the GAO review process was underway, (the decision was later issued on July 31, 2012), NSF investigated YRC's allegations that Golden Key violated FAR 3.104-3(b), and the Federal Procurement Policy Act, 41 U.S.C. § 423 (2006), *amended by* 41 U.S.C. § 2101-2107 (Supp. V 2011), (the "Procurement Integrity Act" or "PIA").[4]

YRC's allegations were based on Tingle's transfer of the Staffing Plan to Golden Key during preparation of the GSA proposal, and its later inclusion in Golden Key's NSF proposal. YRC alleged that the information was proprietary, that Golden Key knew it was receiving proprietary information, and that Golden Key used the information to represent itself falsely, because NSF would be under the impression that the language originated with Golden Key. AR 1223-27.

The contracting officer notified Golden Key of YRC's claims and gave it an opportunity to respond, which Golden Key did on May 17, 2012. AR 1656-57. In her response, CEO Gretchen McCracken asserted that the disputed information was sent by Tingle when he was a YRC employee and authorized to send the content; that, although some of the material ended up

---

[4] FAR 3.104-3(b) forbids "knowingly obtain[ing] contractor bid or proposal information or source selection information before the award of a federal agency procurement contract to which the information relates." FAR 3.104-1 defines "proposal information," as "[i]nformation marked by the contractor as 'contractor bid or proposal information' in accordance with applicable law or regulation."

in the NSF proposal, it was merely boiler-plate; that it accurately described Golden Key's model and intent; and that nothing on the documents received from YRC was marked as proprietary. She specifically wrote:

> The information is . . . generic, high-level information that can be found in the public domain and that generally describes Golden Key Group's pre-existing processes, as well as the processes of the industry as a whole. Indeed, Golden Key Group has long had a robust system and processes for identifying and retaining personnel and for program management, which we articulated at a much more granular and detailed level in both our NSF proposal and prior proposals. Further, the information was not provided to Golden Key Group with any markings or in a way that would cause Golden Key Group to think that this universally accepted information was considered proprietary by YRCI.

AR 1420.

In its complaint here, YRC contends that it did not receive an opportunity to reply to the Golden Key response, but there is no assertion that failing to do so violated any requirement of law, or that YRC even requested such an opportunity. In any event, we note that YRC made two lengthy written submissions to the contracting officer, and that there was a discussion between YRC counsel and the agency concerning YRC's allegations. AR 1655.

After investigating the allegations, the contracting officer issued a final decision concluding that insufficient evidence existed to show a PIA violation. AR 1657-58. He found that the emails sent to Golden Key by Ms. Wingate on February 28, 2011 and March 1, 2011 gave Tingle permission to share YRC's material with Golden Key. AR 1658. Furthermore, the attachments to Tingle's emails had no proprietary markings. AR 1657.[5] He therefore rejected the allegation of a PIA violation, concluding that there was "insufficient information to show misconduct on the part of Golden Key." AR 1657-58.

---

[5] The contracting officer did not address the import of the statements at the bottom of Tingle's email to the effect that the email might contain proprietary information, perhaps because the complaint letters that YRC counsel sent to him made no argument on that basis. AR 1069-1074, 1220-21.

9

What remained of YRC's assertion to the agency was that Golden Key had plagiarized from YRC's material. AR 1658. The contracting officer dismissed this concern, pointing out that the very limited portion of page 11 which could be traced to YRC's Staffing Plan or the GSA proposal was not the basis for the strong ratings assigned to Golden Key. The 'very good' rating for the management plan was not "significantly impacted" by the disputed content. The significant strengths did not cite page 11, and the strengths that did were supported by content other than the disputed information. AR 1658-59. Moreover, as we noted above, the point at which the material was inserted into Golden Key's proposal related to Golden Key's internal staffing, not what it proposed to do directly on behalf of NSF.

On June 8, 2012, NSF filed a report in the still-pending GAO protest, transmitting its rejection of YRC's allegations and explaining its conclusions that Golden Key had not engaged in any misconduct and that the source selection decision had not been affected by the possible plagiarism. After relying on a statement of facts provided by the contracting officer, the general counsel of NSF reported that YRC "has provided no evidence to support its allegations, has misrepresented or misinterpreted the facts, or is simply disagreeing with NSF's evaluation of its proposal." AR 33.

In doing its evaluation, GAO characterized YRC's claims as follows: "plagiarism and industrial espionage"; material misrepresentation to NSF; lack of qualifications of non-key personnel of Golden Key; and NSF's alleged violation of FAR 8.4 in not properly scrutinizing Golden Key's "proposed level of effort and labor mix" in the price analysis. AR 1826.

GAO issued its decision on July 31, 2012. AR 1824. It ruled that the misrepresentation issue was a private dispute between YRC and Golden Key, although in a footnote it stated that the agency had not, in any event, relied on the disputed information. AR 1830 n.7. It also found that YRC's challenge to the merits of NSF's evaluation was without merit because the agency did not rely on descriptions of non-key personnel, and it found no fault with NSF's price analysis. AR 1831.

On August 10, 2012, YRC filed its complaint here. The focus of its attack is the contracting officer's procurement integrity decision, and not the underlying source selection decision. YRC argues that Golden Key misled NSF by falsely claiming YRC's proprietary information as Golden Key's, that

Golden Key violated FAR 52.203-13(b)(3)(i)(A) by not reporting that misrepresentation, and that Golden Key engaged in a "bait and switch" by its employment of YRC staff after it received the award. YRC seeks a permanent injunction preventing Golden Key's further performance on the contract and directing NSF to award the contract to YRC or to reevaluate the proposals.

## DISCUSSION

**Standard of Review**

This case is unique, in that there were two decisions by the agency here. The first was the source selection decision by the contracting officer, made on a best value basis, to award the task order to Golden Key. That decision can only be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004). Although the complaint arguably contains a challenge to the source selection decision, the sole focus of attack in the complaint and in plaintiff's initial merits brief is the contracting officer's rejection of YRC's allegation that Golden Key engaged in a procurement integrity violation.

Bid protests are typically addressed through motions for judgment on the administrative record, which are the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum v. United States,* 404 F.3d 1346, 1356 (Fed. Cir. 2005). Questions of fact are resolved by reference to the administrative record. *Id.* Our standard of review is the same as that found in the Administrative Procedures Act. 28 U.S.C. § 1491(b)(4) (2006) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Thus, we may hold unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Insofar as the source selection decision is concerned, there is no question that this typical scope and standard of review apply. And, particularly in respect to decisions made on a "best value" basis, the agency's discretion is entitled to heightened deference. *See Banknote*, 365 F.3d at 1355 (Fed. Cir. 2004) (stating that the agency is entitled to a "great deal of discretion . . . particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value").

11

Plaintiff's real challenge here, however, is to the subsequent procurement integrity decision. YRC argues that a possible misrepresentation entitles it to a different standard of review. It contends that the contracting officer's decision is entitled to no deference and argues, instead, that the court should approach the issue on a de novo basis.

We disagree. Plaintiff seeks review of a final decision by the contracting officer to make an award pursuant to 28 U.S.C. § 1491(b), albeit in the face of procurement integrity challenge. In other cases in which an agency investigated allegations of impropriety in connection with a procurement, this court has reviewed the agency's decision pursuant to the test set out in section 706(2)(A). *See, e.g.*, *Chenega Mgmt., LLC. v. United States*, 96 Fed. Cl. 556, 585 (2010) (reviewing with deference an Air Force investigation and decision based of allegations of bribery of an Air Force Colonel by a contractor); *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 192-93 (2006) (upholding decision not to disqualify a bid after allegations that the company took proprietary information from a competitor and used it for an advantage in the proposal). While plaintiff cites *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007), for the proposition that we should undertake a de novo review of the misrepresentation allegation, we agree with defendant that *Blue & Gold* and other similar cases are inapplicable because the agencies there did not have the opportunity to investigate and resolve the allegations of misrepresentation. *See also GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 474-78 (2012). Consequently, because the contracting officer here investigated the impropriety and made a final decision, that decision cannot be overturned by this court unless it was arbitrary, capricious, or not in accordance with law.

**Procedural Motions**

Intervenor seeks to supplement the administrative record with the affidavits of Joshua Tingle and Gretchen McCracken. In his affidavit, Tingle recites that he had limited involvement in the NSF proposal and did not "draft or insert text" into the area of the proposal that YRC disputes. Int.'s Mot. to Suppl., Ex. 2 ¶¶ 4-8.[6] In her affidavit, McCracken says that the number of recruiters offered by Golden Key in its proposal was correct and that the number of resumes it should have shown as available to Golden Key was

---

[6] "Int.'s Mot. to Suppl." refers to Golden Key Group LLC's Motion Seeking Leave to Supplement the Administrative Record.

actually higher than the number in its proposal. Int.'s Mot. to Suppl., Ex. 1 ¶ 7. She also reaffirms what she included in her statement to the contracting officer, that Golden Key continues to stand behind its proposal. Int's Mot. to Suppl., Ex. 1 ¶ 11. We take this to mean that, even though the numbers of recruiters and resumes were taken out of the joint proposal to GSA, it happens to be correct, or even conservative, in terms of Golden Key's actual abilities.

The court requested these affidavits because of the unique assertions made by YRC. If Golden Key refused to stand by its proposal because of the allegedly plagiarized information, presumably the agency could not consider its bid and the protest could be terminated quickly in plaintiff's favor. Similarly, if Tingle had drafted that portion of Golden Key's proposal to NSF in which the contested information was included, this would support YRC's claim of prejudice. Intervenor's motion to supplement is therefore granted.

Defendant moves to strike five exhibits attached to YRC's lead brief: Exhibit Y, the Second Declaration of John Jaeger; Exhibit Z, the Declaration of Laura Wingate; Exhibit AA, a 2011 slide presentation by NSF entitled "Technology for Plagiarism Detection"; Exhibit BB, part of NSF's 2010 report to Congress on its internal Inspector General investigations; and Exhibit CC, a redacted version of the same material Golden Key submitted to the contracting officer in connection with his investigation into YRC's allegations. We strike all of Mr. Jaeger's affidavit, except those assertions which would have been relevant to asserting prejudice. Pl.'s Brief Ex. Y ¶¶ 21-32. The balance of Mr. Jaeger's declaration consists of descriptions of YRC's processes and competencies, assertions of misconduct by Golden Key, and legal conclusions. These assertions are either irrelevant or should have been made to the contracting officer. Ms. Wingate's declaration is brief and makes one point: someone else told her that Joshua Tingle worked on the Golden Key proposal to NSF. It is admitted as potential evidence to support Tingle's involvement in both proposals, but it cannot be considered because the statement is clearly inadmissible hearsay.[7] Exhibits AA and BB are irrelevant and untimely. Exhibit CC is irrelevant and duplicative.

Finally, YRC seeks to amend its complaint to make clear that it wishes to assert that NSF failed to follow the announced evaluation criteria. Arguably such a contention is embraced within the legal claims made by the initial

---

[7] We note, in any event, that Tingle concedes the substance of what Ms. Wingate's source alleged: he was involved in drafting the proposal.

complaint, although no facts are asserted in support. The sole focus of the complaint is the procurement integrity decision. As we explain below, however, even if we allowed the amendment, the new grounds asserted in support are drawn exclusively from defendant's briefing and do not provide grounds for overturning the source selection decision. Accordingly, we deny the motion to amend.

**Motions for Judgment on the Administrative Record**

*Source Selection Decision*

The complaint and plaintiff's first round of briefing offered no basis for challenging the source selection decision. In its proposed amended complaint, however, plaintiff points to language in defendant's briefing that the contested language "was peripheral to the scope of work." Def.'s Brief 20.[8] Another statement that plaintiff points to is, "[m]ore than anything else, the [source selection decision] emphasized Golden Key's lower price." Def.'s Brief 20. From this, YRC argues that defendant has thereby admitted that NSF did not follow the selection criteria. We disagree. Plaintiff reads too much into these statements. Defendant is accurately portraying the contracting officer's reasoning in rejecting the challenge to Golden Key's use of YRC language in its proposal. The contracting officer, fully aware as the source selection authority as to how the technical factors of the proposals were weighed, concluded that the allegedly cribbed language was simply not that important. The language related only to Golden Key's internal hiring process, not to how it would directly engage in assisting NSF, and it was embedded in other, rather generic, self-assessing language in which Golden Key characterized its management approach. Collectively that portion of the proposal supported the 'very good' rating. Nothing in the administrative record or in defendant's brief warrants our second guessing the contracting officer's source selection determination.

*The Contracting Officer's Rejection of Plaintiff's Procurement Integrity Act Challenge*

Although it is not written in the clearest terms, we think a fair reading of the contracting officer's decision is that there was no support for the

---

[8] "Def.'s Brief" refers to Defendant's Motion for Judgment Upon the Administrative Record and Response to Plaintiff's Motion for Judgment Upon the Administrative Record.

allegations of a Procurement Integrity Act violation because the information was not proprietary, and even if it was, it was not "stolen," as plaintiff alleged. What he concluded, in effect, is that the most plaintiff could establish is that Golden Key plagiarized language from YRC. However, such plagiarism was immaterial because Golden Key stood by the representations it made, and they were, in any event, not very important to the agency's substantive evaluation.

To the extent plaintiff persists in characterizing what happened as "theft," we agree with the contracting officer. There is simply no support for the exaggerated assertions made. Tingle had authority to send the controverted material to Golden Key, and it was not labeled as proprietary. It is baseless to assert that the boiler plate language at the bottom of the covering emails regarding the possibility of proprietary information turned this into a case of misappropriation. The parties had adopted a protocol for labeling legitimately private information, and it was not utilized. Plaintiff has made no serious effort to prove that Golden Key should have known from the circumstances of the transmission and use of the material that YRC expected it to be treated as protected. Moreover, the material was incorporated into the parties' joint proposal to GSA, and YRC has not shown that Golden Key should be presumed to have no rights in that proposal.

We agree with the contracting officer that what we are left with is possible plagiarism. The most relevant concern that the contracting officer should have had at that point is whether Golden Key stood by its proposal. He concluded that it would, and we have no reason to question that conclusion, particularly in light of the McCracken affidavit.

What plaintiff is left with, at least with respect to the cribbed language, is its assertion that, by proffering the contested language as its own work product, Golden Key made a material misrepresentation and one which made the award wrongful per se. The only support it offers for that approach is a reference to FAR 52.203-13(b)(3)(i)(A), which required Golden Key to report to the Office of the Inspector General and the contracting officer its own alleged violation of federal law. The purported violation of law refers to the False Statement Act, 18 U.S.C. § 1001 (2006). The false statement, in turn, at least according to plaintiff, is the implicit representation by Golden Key that it drafted all the language included in its proposal. We are reluctant to hold that plagiarism could never be relevant in a contracting officer's evaluation of the merits of a proposal, but we are comfortable holding that the contracting officer's treatment of the asserted plagiarism here was unassailable. The

notion that Golden Key should have reported itself for a criminal false statement by virtue of its inclusion of the language in dispute here is completely without support.

Nor do we find error in the contracting officer's conclusion that NSF's selection of Golden Key was not materially dependent on the language at issue. We cannot find that his determination was arbitrary or capricious, in view of the context of the representations (what Golden Key would do to maintain its own staff), as well as the other, non-offending language supporting the agency's evaluation. The contracting officer was well within his discretion to decide that, even if the evaluators had known that the language did not originate with Golden Key, they still would have assigned it the various strengths it received and given it no deficiencies. None of the two significant strengths relied on the information, and because no weaknesses existed, Golden Key would still receive a 'very good' rating under the solicitation requirements. *See GTA Containers*, 103 Fed. Cl. at 484-86 (finding a material misrepresentation in a proposal where the Marine Corps placed "great emphasis" on the proposal that falsely claimed the use of a certain component supplier); *Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 537 (2008) (involving the fuel efficiency of a tanker in a charter contract with the Navy).

Moreover, for the reasons we set out above, it was unnecessary for the contracting officer mentally to ignore the representations. Golden Key stood by them. The fact that they may have been plagiarized was immaterial to an evaluation of the substance of the proposal.

Finally, plaintiff contends that Golden Key engaged in a separate misrepresentation when it "proposed a team of personnel comprised entirely of non-YRCI employees"and then, immediately after award, hired virtually all the YRC incumbent personnel. Pl.'s Brief 40. Plaintiff characterizes this as a "bait and switch." It points to a personnel chart in Golden Key's technical proposal, which recites that "GKG will prioritize the contract project team into a structure organized for accountability with performance standards in place as illustrated in Figure 1.2-1." AR 140. The chart contains the names only of Golden Key personnel. It is undisputed that, after award, Golden Key hired or has made offers to many incumbent YRC personnel.

We agree with intervenor and defendant that this conduct did not constitute a misrepresentation of Golden Key's announced intent. Its proposal

included a statement that it would offer incumbent personnel a right of refusal, AR 138-39, and that Golden Key would use "qualified and client approved current contractor staff." AR 137. Moreover, the administrative record includes the following question and answer during the pre-bid process: "Q. Will the awardee be expected to hire incumbent personnel? . . . Answer: It is up to the winning contractor to decide whether to hire the incumbent or not." AR 122 (emphasis omitted). And on page 24 of its proposal, and in its "key personnel" section, while Golden Key offers the resumes of only Golden Key employees, it notes that Golden Key offered its own staff, contingent upon "incumbent capture." AR 159. There was no "bait and switch."

## CONCLUSION

For the reasons stated above, we grant intervenor's motion to supplement the record; we grant in part and deny in part defendant's motion to strike the five exhibits attached to plaintiff's brief; we deny plaintiff's motion to amend the complaint; we deny plaintiff's motion for judgment on the administrative record; and we grant defendant's motion for judgment on the administrative record. The Clerk is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge
